JOHN ELLIOTT, Administrator of Estate of EARL D. ELLIOTT, v. JOHN BARTON PAYNE, Agent For The President Under the Transportation Act of 1920, Appellant.

### Division One, April 8, 1922.

1. **FEDERAL EMPLOYERS' LIABILITY ACT: Locomotive Fireman: Station Platform: Verdict Binding.** The verdict of the jury on conflicting evidence in a suit based on the Federal Employers' Liability Act for death of a locomotive fireman charged to have been caused by a defective railroad depot platform, is binding on the appellate court on the question of whether such platform was reasonably safe.

2. ———: ———: ———: **Action is Statutory.** In a suit based upon the Federal Employers' Liability Act, the cause of action must appear to have arisen from the breach of some duty of the master to the person injured, specified in the statute itself, otherwise the plaintiff's action must fail

3. ———: ———: ———: **Not Embraced Within Terms of Statute.** Where a locomotive fireman, for some undisclosed purpose, alighted from his slowly moving engine on a railroad station platform which was maintained in a defective condition so as to permit the accumulation thereon of ice and snow, upon which the fireman stepped and was precipitated under the engine and killed, the administrator of his estate, suing under the Federal Employers' Liability Act for his death, was not entitled to recover, inasmuch as such platform was not, as to such fireman under such circumstances, embraced within the terms of said act, not being one of the "cars, engines, appliances, machinery, track, road-bed, works, boats, wharves or other equipment" of the railroad.

4. ———: ———: ———: **Way.** As to a fireman of a passenger train, a railroad station platform is a mere way, and not a working place, and as the word "ways" of the original Federal Employers' Liability Act of 1906 was dropped from the later Act of 1908 the administrator of his estate has no right of action under such statute, but his right of action, if any, is under the common law.

5. ———: ———: ———: **Place of Duty: Burden of Proof.** The burden was upon the plaintiff to show that the deceased fireman was in the service of the master at the time of the injury and that, if temporarily absent from his place of duty, he was absent

for a purpose not inconsistent with his employment; and as there was no evidence showing the purpose for which he alighted from his engine, plaintiff was not entitled to recover, notwithstanding the fact that there was evidence that trainmen frequently got lunches at the station where the injury occurred.

6. ———: ———: ———: ———: **Presumption.** The evidence having shown that the deceased fireman had left his place of work, there was no presumption that he was in the line of his duty.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen,* Judge.

REVERSED.

*B. J. Woodson* and *Strop & Mayer* for appellant.

(1) The court erred in refusing to give defendant's instruction in the nature of a demurrer, offered at the close of the evidence. (a) The deceased had no duty requiring him to alight from a moving train; on the contrary, his duty required him to remain on the train until it stopped. There is no evidence that any emergency called upon him to deviate from his duty; therefore, the defendant owed no duty to furnish deceased a reasonably safe place to alight from the moving engine, and it must follow, even if there was a failure to furnish such a place, it was not a breach of any duty which defendant owed to the deceased. Thompson on Neg. sec. 4677; 1 Bailey on Personal Inj., 219, sec. 79; Berry v. Railroad, 98 Mo. 70; Schaub v. Railroad, 106 Mo. 92; Stag v. Tea Co., 169 Mo. 496; Karth v. Railroad, 105 Atl. (N. J.) 10; Louisville & Nashville Railroad v. Hocker, 111 Ky. 707; Shadoan's Adm. v. Railroad, 26 Kyl. L. Rep. 828; Byram v. Railroad, 154 N. W. 1006; Hobbs v. Great Northern, 142 Pac. 20; Reeve v. Northern Pacific, 144 Pac. 63; Kennedy v. Chase, 119 Cal. 637. (b) The photographs in evidence show indisputably that the platform was such a platform as is maintained by all railroads, and that it was as nearly perfect as even the highest degree of care would require. Neither witnesses nor juries should be permitted to pronounce as dangerous that which the physical facts show

to be reasonably safe.   (c)   The deceased, being an ex, perienced fireman, knew that during winter weather there was likely to be some ice on any depot platform in Kansas, and, therefore, as a matter of law, he assumed the risk of coming in contact with ice when he jumped from the moving engine.   Under the circumstances the risk was obvious.   Pryor v. Williams, 41 Sup. Ct. Rep. 36.   (2) The court erred in giving plaintiff's instruction number one.   (a)   The instruction was erroneous in submitting questions with no evidence upon which the jury could predicate a finding.   Wilkerson v. Eilers, 114 Mo. 253; Mateer v. Mo. Pac. Ry. Co., 105 Mo. 353; Modlagl v. Iron Co., 248 Mo. 601.   (b)   The instruction was erroneous in that it permitted plaintiff to recover if defendant was guilty of a breach of duty to any employee, regardless of whether or not that duty was owing to plaintiff.   The instruction again and again told the jury that if the platform was dangerous to employees of the defendant, then the defendant was liable. 20 R. C. L. 47, sec. 41; 1 Sherman & Redf. on Neg. (5 Ed.) sec. 8; Feeback v. Railroad, 167 Mo. 206; Morris v. Rounsaville, 132 Ga. 462; Williams v. Railroad, 139 Ill. 491.   (3)   The judgment in this case is grossly excessive and should be reversed for that reason.   Bank v. Davis, 233 S. W. 406.

*W. B. Norris* and *Barney E. Reilly* for respondent.

(1)   The defendant was required to furnish a reasonably safe platform at its station, and if the platform so furnished was maintained in such a way that by reason of its defective condition water and melting snow were likely to and did flow over it and form pools of water thereon by reason of its defective condition and in cold weather such pools of water were likely to and did freeze and form ice and that thereby a dangerous obstruction was maintained by it, then the defendant was negligent. Whether the platform was in such condition was a jury question.   Waterbury v. Ry. Co., 104 Iowa, 32; Melody v. Railroad, 161 Iowa, 695; Renn v. Ry. Co., 170 N. C. 128; Murphy v. Paper Co., 156 Wis. 9; Ferebee v. Ry.

Co., 163 N. C. 351; Ry. Co. v. Bransteeter, 200 Fed. 255; Wilson v. Express Co., 165 S. W. 36; Johnson v. Ry. Co., 164 Mo. App. 600. (2) Elliott in leaving his engine was in the line of his duty and engaged in interstate commerce. Neither the period or nature or continuity of service is changed by a brief stepping aside from or cessation of activities, if, for instance, visiting a wayside place for a lunch or other legitimate and common means of refreshment, the employee all the time being within customary reach for continuance of the duties of service. Such action is not an abandonment of the employment, but a mere suspension, and under the evidence Elliott leaving the engine for any purpose was not an abandonment of his employment, but was within the scope of his employment. Rhea v. Ry. Co., 171 Mo. App. 160; North Carolina Railroad v. Zackary, 232 U. S. 248; Erie Railroad Co. v. Szary, 253 U. S. 86, 64 Law Ed. 794; Philadelphia B. & W. Railroad Co. v. Tucker, 35 App. D. C. 123, L. R. A. Supp. 1915 C, 39, note; Sanders v. Railroad, 81 S. E. 283; Barry v. Railroad, 98 Mo. 70; Graber v. Railroad, 159 Wis. 414; Baltimore & Ohio v. Whitacre, 124 Md. 411, 242 U. S. 169; Willever v. Railroad, 87 N. J. L. 348; Parkinson Sugar Co. v. Riley, 50 Kan. 401; Broderick v. Depot Co., 56 Mich. 261; Thomas v. Railroad, 108 Minn. 485; Northwestern Iron Co. v. Industrial Board, 160 Wis. 633; Davis v. Railroad, 134 Minn. 49; Easter v. Railroad, 76 W. Va. 383; Chicago R. I. Railroad Co. v. Oldridge, 33 Tex. Civ. App. 436; L. & N. Railroad Co. v. Walker, 162 Ky. 209; Ingram v. Ry. Co., 89 Vt. 278; Martin v. Cotton Oil Co., 194 Mo. App. 106; Williams v. Chaff, 222 S. W. 416; Ewald v. Ry. Co., 70 Wis. 420; Adams v. Iron Cliffs Co., 78 Mich. 271; Padgett v. Ry. Co., 99 S. C. 364. (3) In the absence of evidence the presumption is that Elliott was carrying out the duties of his employment. Hartwell v. Parks, 240 Mo. 546; Thornton v. Railway Co., 82 S. E. 433; Flucker v. Steel Co., 106 Atl. 192; Worthington v. Elmer, 207 Fed. 306; Jones v. Ry. Co., 86 N. W. 838. (4) The defendant was required to anticipate that its employees would use the platform in alighting from moving engines

or trains. The rule of liability is that it is not necessary that the particular injury complained of could be reasonably anticipated or even injury to the particular individual. It is sufficient if some injury to some person is likely to happen from the defect. Yarbough v. Lumber Co., 211 S. W. 713.

GRAVES, J.—Action by the administrator of Earl D. Elliott, deceased, who was killed by being run over by a train of the Missouri Pacific Railroad at Green Leaf, Kansas. As originally brought this suit was against the railroad and Walker D. Hines, Director General of Railroads. Later it was dismissed as to the railroad company, and continued as against John Barton Payne, Agent for the President, under the Transportation Act of 1920. The action is one under the Federal Employers' Liability Act. Elliott was a fireman on an interstate commerce passenger train of the Missouri Pacific Railroad Company. There is no question as to the action being properly brought under the Federal act, supra, if as a fact the deceased, at the moment of his injury, was in the performance of his duties as fireman upon such train. Of the latter fact question is made by the defendant.

Deceased undertook to alight from his moving train at the depot platform of the said railroad at Green Leaf. In so doing he fell or was dragged under the train and killed. A negligent construction of this platform is thus stated in the petition:

"That in and about the depot building at said Green Leaf defendant maintained a platform that extended from said depot building to the tracks of the defendant upon which said train was traveling, and that the surface of said platform was maintained in a rough, low and uneven condition with an incline towards said tracks, and that by reason of the edge of said platform being raised above the surface thereof and because of said condition said platform was dangerous for its employees to use the same, and was likely to and did accumulate water, snow and ice in such a way that said water, snow and ice could not flow off from said platform and over said edge,

but that by reason of said edge of said platform being higher than the surface of said platform and by reason of said condition said platform was dangerous and not reasonably safe for the employees of the defendant to use the same.''

Plaintiff then avers that by reason of said faulty construction of this platform snow and ice did accumulate thereon, and especially near the outer edge of said platform, so that at this edge and near the point where one would step in alighting from an engine, there was ''a ridge of said ice and snow, . . . presenting a surface slick, rough, uneven, full of ridges and sloping toward said railroad tracks,'' of all of which the defendant had knowledge for such length of time as to have removed and remedied the same before the accident. Deceased left a widow and one child, for whose benefit this action is brought. The modest sum of $100,000 damages is asked, and the jury returned a verdict for $30,000. By forced *remittitur* this was reduced to $25,000 and from a judgment for that sum the defendant's appeal is taken.

By answer, Payne first admits his official capacity, and denies all other allegations of the petition. Further portions of the answer aver, (1) that Elliott was not engaged in the business conducted by Walker D. Hines, as Director General of Railroads, at the time of his death, December 13th, 1919; (2) that Elliott was guilty of contributory negligence; (3) that the injuries to Elliott were the result of the risks ordinarily incident to the business in which Elliott was engaged; (4) that the deceased was not a resident of Missouri, and had no property in Missouri, but was a resident of Kansas, and that in the appointment of the administrator, now suing, fraud was practiced upon the Probate Court of Buchanan County, Missouri, and (5) the pendency of a proceeding in such probate court to revoke the appointment of such administrator. Reply was a general denial. Details of the evidence will be left to the opinion, as such evidence may be applicable to the several points made. Such is the outline of the case.

I. The outline of the answer, which we have given in the statement, would indicate some questions which evidently have been abandoned by the defendant. The assignment of errors proper, as found in the brief, covers but three matters, as follows:

*Assignments.*

"The court erred in overruling defendant's instruction in the nature of a demurrer.

"The court erred in giving plaintiff's instruction number one.

"The court erred in giving plaintiff's instruction number five."

In the fourth point in the brief it is urged that the verdict is grossly excessive. These four matters and the natural subdivisions therof constitute the questions for decision. As to whether a demurrer to the evidence should have been sustained, three things are to be considered: (1) was there actionable negligence shown as against the defendant, (2) was deceased in the line of his duty at the time of the accident, and (3) did he assume the risk, as such risk is defined by the Federal courts in the construction of the Federal Employers' Liabilities Act? In view of the whole situation the vital question is that of liability or no liability. We shall therefore take these alleged errors in their order, because if the record shows no liability, further questions become immaterial.

II. The train was going west, and as it approached the station of Green Leaf the deceased stepped from his engine on to the eastern end of the depot platform, as testified to by plaintiff's witnesses. This platform was of considerable length (200 feet) and extended for some distance both to the east and west of the depot proper. It was constructed of brick placed side by side, with a sand filling between them, as we gather it.

*Fireman: Injury on Platform: Not Included in Federal Act.*

Around the outer edges was a concrete curbing. At places the top of this curbing was flush with the top of the brick. At least at some places the top of the bricks was lower than the curbing. At those places

narrow strips of water would accumulate and freeze. The platform sloped slightly toward this curb, which curb was near the first rail of the railroad tracks.    It was ice formed in this way that occasioned the injury, as it is alleged.

As said this is an action under the Federal Employers' Liability Act.    The first act (1906) was declared unconstitutional, and the present amended law has for its basis the Act of 1908.    The difference between the two acts may have occasioned some rulings in the lower Federal courts, and State courts, which would not be strictly applicable now.    The Act of 1906, as to acts for which damages may be recovered, provided:

"For all damages which may result from the negligence of any of its officers, agents, or employees, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, road-bed, ways or works."

The Act of 1908, as to the same subject provides:

"For such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, road-bed, works, boats, wharves, or other equipment."

It will be noted that the word "ways" is used in the Act of 1906, but is not used in that of 1908.    In 1908 there were added the words "boats, wharves or other equipments."    With this outline of facts and law, we take the first contention of appellant as to the overruling of its demurrer to the evidence.

(a)    It is urged that there was no duty to furnish a platform to deceased, and that absent a breach of duty there was no negligence.

(b)    That there was no duty to defendant that required deceased to leave his moving engine, and under such circumstances there was no duty to have a platform upon which he could alight in performance of any duty to the master.

(c)   That the evidence disclosed a reasonably safe walk.

We shall dispose of the latter contention first.   If there was a duty devolving upon the defendant to build and maintain this platform in a reasonably safe condition for the use of the deceased, then the most that can be said is, that the evidence conflicts, and the jury's verdict binds this court.   Plaintiff had evidence tending to show that at places the bricks were lower than the curbing, and this condition permitted the accumulation of water and ice.   Whether the defects were in the original construction, or appeared later by reason of use and the sinking of the bricks into the base upon which they were placed, can make no material difference.   The charge in the petition is that defendant maintained the platform in a defective condition.

Going to the first suggestion, was there a duty to maintain the platform for deceased?   Reverting to the petition it will be noted that the negligence charged is that of the "defendant" and not as to defendant's officers, agents or employees.   The action is under the latter clause of Section 1 of the Federal Employers' Liability Act, which reads:   "Or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, road-bed, works, boats, wharves, or other equipment."   Query:   Does a depot platform fall within this enumeration?   The statutory negligence, or neglect of duty, is as to the things mentioned, and none other.   If a platform falls within the things named, then a neglect of duty as to the platform gives actionable negligence; if not, then there is no negligence in the case, and plaintiff must fail in her action under this statute.

It has been suggested that the two classes of negligence named in this statute (1)   that of the officers, agents and employees, and (2)   that of the company in permitting defects in named things, overlap.   [1 Robert's Federal Liabilities of Carriers, sec. 527, p. 912.]   The conclusions of the learned author in a part of the section may not be exact.   He speaks of the non-delegable duties

of the master, which duties, of course, must be performed by an officer, agent or employee in the case of a corporation. As to non-delegable duties the thing to be done must be done by the master, and although done through the officers, agents or employees, the acts are those of the master or the corporation, and the negligence is that of the master, if there be negligence in the performance of the non-delegable duties.

We think the purpose of the Act of 1908 was well stated by Mr. Dolliver of Iowa, when it was before Congress. He said that it had a four-fold purpose, (1) "it modifies the old law of the negligence of co-employees" (2) "the second proposition modifies the law whereby in other generations workmen were liable to assume the risks arising from defective machinery," (3) "this proposed statute modifies radically the law of contributory negligence," and (4) "in the fourth place, the proposed bill undertakes to modify somewhat the common law applicable to certain agreements and contracts between employers and their workmen." [Thornton's Federal Employers' Liability Act (3 Ed.) pp. 1 and 2.]

However writers and courts may differ in their views as to just what is covered by this statute, and as to whether the particular negligence falls under the first or second class of negligent acts named in the statute, it must be clear that the statute undertakes to change and modify the common law. In a sense it creates liability where there was none at common law. It destroys defenses which were recognized at common law. It makes that negligence of the master which was not his negligence at the common law. These radical changes are by statute, and it is to the statute that we must go to determine the master's negligence in a case brought under the statute. Suppose the statute (in its second specification of negligence) had stopped with the words "cars, engines, appliances, track, road-bed," could it be said that a defective station platform would be an actionable negligent act of a defendant under the statute? We think not, because it would not fall within any of the terms thereof. If not then there could be no action under the Act of 1908 and

its subsequent amendment in 1910 for such neglect or negligence. Congress, as ruled by the courts, had the power to pass the law, and of course had the right to limit the things, defects in which should constitute negligence. Congress could have limited the law to engines, cars, tracks and road-beds. If it had, defects in appliances other than those named, would not be actionable under the statute. For action thereon the party would be relegated to his common-law rights. In other words, the right to sue under this act is limited to the things mentioned in the law, and if a depot platform, maintained chiefly for the general public, rather than the employees of the railroad, does not fall within the act, then there was no actionable negligence. We have indicated above that a depot platform would not fall under the terms, "cars, engines, tracks, road-bed or appliances." The ordinary meaning of these words is well understood. The remaining words used are, "machinery, works, boats, wharves or other equipments." It is clear that a depot platform would not fall under the head of either "machinery" "wharves" or "boats," so that we have left the two words "works" and "other equipments."

I find no case from the United States Supreme Court wherein either of these two words has been defined, nor are we cited to one in the briefs. By this we mean, defined as used in this statute. There are several state statutes having the word "works" in a different combination of terms from the terms used in the Federal act. A familiar combination in these state statutes is made up of the words, "ways, works and machinery," and the laws are applicable to manufacturing and other business, as well as to railroads. It is clear that a word in a given combination of words might have a broader meaning than it would have in a totally different combination. We do not think that "other equipment" as used in this statute covers a depot platform. The word equipment as used in a statute or contract is thus defined in 22 R. C. L. p. 902:

"The word 'equipment' as used in a contract or statute relating to railroads has been held to mean the

necessary adjuncts to the operation of a railroad such as cars, locomotives, and other movable property. The term cannot, however, be construed to include everything that is necessary to the operation of the road and is not broad enough to include structures such as machine shops, roundhouses, and the like.''

The term is one that is applied more to personal and movable property, than to fixed or real property. [See note in 27 Ann. Cases, 1913 B, p. 198; People v. St. Louis Ry. Co., 176 Ill. l. c. 522; Rubey v. Coal Co., 21 Mo. App. 159.] The term ''is not broad enough to include structures like machine shops, round-houses and the like.'' [National Bank v. Gulf Ry. Co., 95 Tex. 176.] Under the authorities a depot platform does not fall within the meaning of the term ''other equipment.''

If the depot platform falls within the terms of the Federal act at all, it must be that the word ''works'' as used therein includes it. If not, it is beyond the purview of the statute. As said, cases from the state courts are unsatisfactory, because of the different language used. Thus in Bowers v. Conn. Riv. Railroad, 162 Mass. l. c. 317, it is held that a loaded freight car, in a switch-yard, where trains are made up, was a part of defendants' ''work and machinery.'' The statute covered ''ways, works and machinery,'' but was broadened pending the case decided.

In a tax proceeding in Virginia, City of Richmond v. Richmond & Danville Railroad Co., 21 Gratt. l. c. 608, it is said:

''The word 'works' is one of very extensive significa-tion. In military engineering, it means fortresses, for-tifications, ramparts, bastions and the like. In civil en-gineering it is often applied to depots, engine-houses, bridges, embankments and other structures essential to the franchise and the proper conduct of a railway, or other work of public improvement. It is very clear that it is in this sense the word is used in the present charter, and was intended to apply to all the property, real and personal, owned by said company, and necessary to the management of the road.''

So, too, under the New York statute, which covers "ways, works and machinery" it was ruled in a suit against a brewing company, that the word "ways" covered only passage ways from point to point in the plant, but that the word "works" covered "all the real-estate, buildings and machinery used in the particular business."

In a case in Missouri involving the construction of a contract wherein the words "works" was used, this court in Land Co. v. Pitt, 114 Mo. l. c. 140, said:

"The word 'works' is often used as meaning, 'An establishment for manufacturing, or for performing industrial labor of any sort; generally in the plural, including all the building, machinery, etc., used in the required operations, as iron-works.' [Century Dictionary.] The word was, we think, used in this sense here, that is to say, meaning the buildings and machines of the Omaha plant. The parties could not have used the word in any other sense when they say the works shall be transferred from Omaha; for the works at that place were not and had not been in operation for fourteen months."

Other cases might be cited under these state statutes using the words "ways, works and machinery" wherein the words "works" has been given the significance indicated above. But is it used in this broad sense in this statute? We think not. If it was so used, there was no use in using the words "tracks, road-beds, or wharves." If the word "works" was intended to cover "all the real-estate, buildings and machinery used in the particular business" as held by some state courts under the peculiar wording of their statutes, the Federal Congress should have used the word "works" and quit. The meaning of the word in this Federal act must be measured by the use of it in connection with the other words used. When so used it clearly has reference to working places other than the tracks, road-bed, and their incidents. Railroads have repair shops, engine houses, warehouses, railway yards, switchyards, and other working places, wherein employees may be engaged in work for

interstate commerce. It is evidently to these places to which the word "works" applies. It certainly does not apply to a depot platform, except so far as such platform may be used by the particular employee as a working place. The working place of an engineer or fireman is not on a depot platform. A switchman may have his working place in the yards, and other employees have theirs in shops and other working places along the line. But it is evident that a depot platform is not a working place for an engine fireman, and therefore not within the term "works" as used in the statute. So viewing it, we rule that the demurrer to the evidence should have been sustained in the instant case. Whatever rights the plaintiff may have under common law, or under statutes of Kansas, the place of injury, are not here. The only question here is the right under the Federal statute. Under this statute the evidence discloses no right of action.

III. We have called attention to the fact that the the Act of 1906 used the word "ways," but this word was significantly dropped from the Act of 1908. The divers state statutes had this word in them, but wherever it has been defined, it has been held to mean passage ways in the plant used in the business.

**Ways: Station Platform.**

A depot platform, so far as its general use by the public is concerned, is largely a passage way from the outside world to the trains of the company, and from those trains to places outside of railroad property. In a very limited sense it may be a working place for certain classes of employees. Those employees whose duties require them to unload passengers, baggage or freight, might say that it was a working place, but to other employees it would be a mere way of ingress and egress. Deceased was not in an employment which required him to use the platform as a working place. To him it was a mere way, which was dropped from the statute in 1908. Like a passenger, his representative might have had a right of action for the maintenance of a defective way, but not under this statute.

IV.  It is claimed that deceased was not in the service of his master when the accident occurred.  Further facts should be stated.

The passenger train upon which deceased was fireman was scheduled to leave Atchison, Kansas, at 10:30 a. m.  It left St. Joseph, Missouri, at 9:15 that morning, according to the evidence of the father of deceased, who was a passenger on it from St. Joseph to Atchison.  The train ran from Atchison to Downes, Kansas.  When on time it was due at Downes at 8:10 p. m.  It was due at Goffs, a station fifty miles from Atchison, at 12:30, and at this station there was a regular stop for dinner.  The crew and the passengers took dinner at Goffs each day on this run.  They did so on the day of the accident, although the train was somewhat late that day. It was 67 miles from Goffs to Green Leaf, and the evidence shows that the schedule speed of the train was 23 to 24 miles per hour.  It arrived at Green Leaf at 4:55 that evening, when if on time it should have arrived about 3:45.  The distance from Atchison to Green Leaf was 117 miles, and the schedule speed about 24 miles per hour including the stops.  Deceased was not a regular fireman on this run, but was what is called an extra fireman, and he was running as such on this trip and the trip before. There was a hotel and restaurant close to the depot at Green Leaf, and the evidence tends to show that members of train crews frequently got lunches there. The train had a ten-minute schedule stop at Green Leaf, but if running late it did not take the full time, but only such time as was necessary for the hostler to coal and water the engine.  It should be remembered that Green Leaf was not a scheduled stop for meals, but the evidence tends to show that train men frequently got lunches at this restaurant.  If the train was late arrangements could be made for meals at Concordia.  We conclude that the reliable testimony only goes to the effect that trainmen, both passenger and freight, frequently got lunches at Green Leaf.  One boy went further, and said that *all* train men on *all* trains got lunches at Green Leaf, but in the same breath said that

*Place of Duty: Master's Business.*

this passenger train was due at 3:45 when on time, and other trains came in at unseemly hours for either meals or lunches. After eating at Goffs between 12:30 and one o'clock it is hardly reasonable to think that all of a train crew would rush out for a lunch at 3:45, and the other testimony does not so indicate.

The train in question arrived at 4:55 and was a little more than an hour late. It was a short train of five cars, but had lost some time. Deceased left his engine when the train was running from eight to ten miles per hour (as indicated by the weight of evidence), and in stepping to the platform, or whilst running along with his engine, with his hand on a hand-hold, he slipped and fell under the train. His engineer did not know that he had left the engine, until after the accident. He had no duty to perform at Green Leaf further than to start the bell to ringing, see that it kept ringing, and watch ahead for persons approaching the track upon his side of the engine. The evidence discloses such were his duties, but courts might take judicial knowledge of the fact that the fireman, in approaching the depot in a town, would have the duty to keep a look-out. There isn't a word of direct testimony as to why or for what purpose the deceased left his moving engine. The cases (both Federal and State) all hold that the burden is upon the plaintiff to show that the servant was about the business of the master at the time of the injury. Without this pleading and proof there can be no recovery.

In Barry v. Hannibal & St. J. Ry. Co., 98 Mo. l. c. 70, this court said:

"While it was not the duty of an engineer to leave his engine for the purpose of getting signals, still it cannot be ruled as a matter of law that the plaintiff must fail in this suit because Barry stepped out on the main track to get the signals, even though it was no part of his general duties thus to do. *As a general rule it may be conceded that a servant has no claim upon the master for damages for an injury which the servant receives by voluntarily assuming to do something which the master did not employ him to do.* Emergencies do arise when he

may be called upon to make slight departures from his accustomed work. [Wood on Mas. & Ser., sec. 89.] So in case of an emergency, he may of his own volition step outside of the line of his usual duties. If the departure be such only as the necessities of the case fairly and reasonably call for, keeping in view the character of the work which the servant has contracted to perform, then such departure will not of itself defeat a recovery of damages in case he is injured. [2 Thomp. on Neg. 1017.] Here the head brakeman had gone to the forward cars, so that he could not transmit the signal from the rear brakeman to the engine, as was the usual practice. The conductor was at the depot. It seems the rear car had not cleared the switch, and the passenger train was then due. Under these circumstances the jury may well have found that an emergency existed which made it proper, or even the duty of Barry, to step out on the main track to get the signals, and the question was one for the jury to determine.''

In the foregoing the italics are ours. We quote so that the views of this court may be gathered, as to the general rule.

There may be incidental cessations from the work being done by the servant, without the loss of a right to recover, if injury happens to the servant whilst upon the premises of the master, and through the negligence of the master. These cessations must be for purposes which are fairly within contemplation of the parties, when the contract was made. Absence from the place of business for the servant's own individual purposes, defeats his right of action. The exception to this broad rule, we find well worded in the case of Ingram's Admr. v. Rutland Railroad Co., 89 Vt. 1. c. 281, whereat the general rule and the exceptions are stated, with a wealth of cases, in the following language:

''We are not unmindful of the general rule that puts a servant outside a recovery from his master, where he has, when injured, left his working place and gone elsewhere on some errand of his own. In such a case the relation of master and servant is temporarily suspended and

is not restored until the servant's return. So, if In-gram's conduct amounts to such a departure from the business of his employer, there can be no recovery here; during his absence from his post the defendant would not owe him the duty of active care, and no actionable negligence would be shown by this record. It is not al-ways necessary, however, to entitle a servant to recover against his master, that he should be at the moment of injury, actually at work in his proper place and in the business of the master. The law allows him some measure of latitude; and while there is a sharp conflict in the cases as to the limits of this latitude, and some apply the general rule above referred to with great strictness, there is much to commend in the inclination manifested by some courts toward a liberal regard for the just interests of the servant in such cases. [Southern Ry. Co. v. Bent-ley, 56 So. (Ala.) 249.] So the circumstances may be such that the master's duty will cover the servant's trip across the premises to and from his working place. [Janilus v. International Paper Co., 92 Atl. (Me.) 653; Whatley v. Zenida Coal Co., 122 Ala. 129, 26 So. 124; Virginia Bridge Co. v. Jordan, 143 Ala. 610, 42 So. 73, 5 Ann Cas. 709.] And the circumstances may be such that a servant may step aside to get a drink of water (Birmingham Rolling Mill Co. v. Rockhold, 143 Ala. 115, 42 So. 96; Woodward Iron Co. v. Curl, 153 Ala. 215, 44 So. 969; Jarvis v. Hatch, 65 N. E. (Ind.) 608); may go inside a building to get warm (Parkinson Sugar Co. v. Riley, 50 Kan. 401, 31 Pac. 1090, 34 Am. St. Rep. 123); may withdraw to answer a call of nature (Houston & T. C. R. Co. v. Turner, 91 S. W. (Tex.) 562); May stop to talk with a fellow workman (Moore v. Pickering Lumber Co., 29 So. (La.) 990); may go to a convenient place to eat or wash (Muller v. Oaks Mfg. Co., 113 App. Div. 689, 99 N. Y. S. 923; Low v. Gen. Steam Fishing Co. (1909), A. C. (Eng.) 523; Rhea v. Mo. Pac. Ry. Co., 156 S. W. (Mo.) 4); to get fresh air (McCloherty v. Gale Mfg. Co., 19 Ont. App. 117); to hang up his coat (Cordler v. Keffel, 119 Pac. (Cal.) 658); or even to rest (Jacobson v. Mer-rill Mill Co., 107 Minn. 74, 119 N. W. 510, 22 L. R. A.

(N. S.) 309)—without forfeiting his rights as an em-
ployee. [See note to Charron v. Northwestern Fuel Co.,
Ann. Cas. 1913 C, 939.] Such digressions and inter-
ruptions are to be expected, and when reasonably neces-
sary, are held to be within the contemplation of the par-
ties when the contract of employment is entered into,
and covered thereby. The relation is not, in such cases,
interrupted, but continues. Whether this is so, however,
depends upon the circumstances, and the question pre-
sented in a given case is usually one of fact. [N. W.
Union Packet Co. v. McCue, 17 Wall. 508, 21 L. Ed. 705.]''

This general rule is recognized by the Springfield
Court of Appeals in two recent cases. [Rhea v. Missouri
Pac. Ry. Co., 171 Mo. App. 160; Martin v. Cotton Oil
Co., 194 Mo. App. 106.]

In the first case the employee went to get a lunch
just before his train was to start, and in the latter he went
to get a drink of water. These, and such like, are inci-
dental things which the parties contemplated in the con-
tract of employment. In Mississippi, going after a news-
paper was held not to have been within this rule, but held
to be a personal act of the employee. The Vermont
court, in the case supra, has diligently collated the cases.
There are others, but they accord with those cited in
Ingram's case, supra. But in all the cases which we
have read there was direct evidence showing the purpose
for which the servant temporarily left his place of duty.
In this case, there is no such evidence. It would be the
merest guess as to what the purpose of deceased was,
when he alighted from that moving engine. The fact that
other employees frequently got lunch there, does not show
that this was the purpose of the deceased at that time.
As said, the burden was upon plaintiff to show that de-
ceased was in the service of the master at the time of
injury, and if temporarily absent from his place of duty,
the burden was upon plaintiff to show that he was absent
for a purpose not inconsistent with his employment. The
evidence fails here, and for this reason the demurrer
should have been sutained. The sole thing upon which
plaintiff's recovery of $25,000 can be sustained is that

the jury could infer that deceased left his place of duty to get a lunch, because trainmen frequently got lunches at Green Leaf. A verdict can not stand upon such a frail structure. It would be the merest guess as to his purpose.

Nor is there a presumption that he was in the line of his duty after it is shown that he had left his place of work. The cases cited (among others, Hartwell v. Parks, 240 Mo. 1. c. 546) upon the question of presumptions are not applicable to the facts of this case.

The judgment should be reversed, and it is so ordered All concur; *James T. Blair, J.,* in paragraph four and the result.