JOHN MILBURN v. CHICAGO, MILWAUKEE, ST. PAUL and PACIFIC RAILROAD COMPANY, Appellant.—56 S. W. (2d) 80.

Division One, December 31, 1932.*

---

*NOTE: Opinion filed at April Term, 1932, September 3, 1932; motion for rehearing filed; motion overruled October 22, 1932; motion to transfer to court en banc filed; motion overruled at October Term, December 31, 1932.

1172

*Morrison, Nugent, Wylder & Berger* for appellant.

*Platt Hubbell* and *Geo. H. Hubbell* for respondent.

1176

HYDE, C.—This is an action for personal injuries. The petition of plaintiff (respondent here) was in two counts. Respondent alleged that he was burned by the explosion of gasoline which was negligently kept in a kerosene barrel. His first count was upon the theory that the defendant, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (hereinafter referred to as the Railroad), was liable for his injuries under the Federal Employers' Liability Act (U. S. C. A. sec. 51-59). His second count was upon the theory that the Railroad was liable for his injuries under the common law

of the State of Iowa, as changed by the Iowa Workmen's Compensation Act, which the Railroad had rejected. It had elected to pay damages, for personal injuries to employees, under the common law and statutes of Iowa, as modified by the Compensation Act. The effect of this was to take away some of the common-law defenses and to establish a different rule as to the burden of proof in cases of injuries to employees arising out of and in the course of their employment. The same facts were alleged in both counts, and they differed only as to matters concerning whether or not respondent was engaged in interstate commerce.

Respondent, who then lived at Mystic, Iowa, was employed by the Railroad, as a member of an extra gang, repairing its main line track through the states of Missouri and Iowa, by taking out cinder ballast and old ties, raising the track, putting in new ties and reballasting with gravel. This work made the track "a good deal more solid and it was safer for a train to pass over it at a high rate of speed." There were over 200 men in the gang, who worked all of the summer and fall of 1928, during which time they covered a large section of the line in Missouri and moved into Iowa. The men lived in bunk cars furnished by the Railroad, about fifteen men being quartered in each car. It was explained by the Railroad's general foreman in charge of the whole gang that "you have to have them in bunk cars to get enough men to do this work, there is not enough men in these little towns." About half of the men employed lived in nearby sections of Missouri and Iowa and the foreman referred to them as "natives." The Railroad furnished them free transportation to their homes every other Sunday. The rest of the men were itinerant track workers, who did not live in these states. They made their homes more permanently in the bunk cars and were referred to by the foreman as "hoboes." When they left the bunk car camp, they usually wanted to go to Kansas City or Chicago and were given transportation there, after working two or three months. The extra gang was organized into three groups under sub-foremen. Two of these groups were kept together and worked together. One group dug up the old ballast and the other raised the tracks and put in and tamped the new ties. The third group (composed mostly of the so-called "hoboes" who followed that work) usually followed them with their camp at a separate place and completed the work. Their job "was to unload the gravel and level up the track, line it up and dress it."

Respondent was a member of the head gang, as were most of the "natives." He testified that he was employed by one of the sub-foremen who told him he would "live at the bunk cars with the gang, kept there and live there, because they couldn't keep properly organized without the men did live there" and "would pay one dollar a day for board and sleep in the bunk cars and do our washing there

and make it our home while working in the gang." Respondent received thirty-five cents per hour for his work. The gang commenced work, in the morning, at seven o'clock, stopped at noon and were fed at the bunk car camp, went back to work at one, and quit at five in the afternoon, six days each week. With the head gang there were two motor cars, operated by Ford engines, which ran on the Railroad track and pulled trailers, upon which the men, their tools and supplies were transported from the bunk car camp to the place of their work. Respondent took care of one of these motor cars, kept it filled with gasoline, water and cylinder oil and did anything else necessary to keep it in good working order. Respondent did part of this work before the other men went out to their work, but when not engaged with the motor car, he helped with the other work of the gang, such as digging out ballast, pulling in ties, spiking them, and unloading gravel off the work train.

It was shown that there was occasionally work to be done on Sunday. This usually was unloading gravel where the track had been raised. Interstate trains were continually running over the track, during the progress of the work, and they had to slow down in crossing the places where the work had not been completed. In order to warn trains where to slow down at night, watchmen (members of the gang) were stationed at these places with lanterns. The evidence was conflicting as to whether the men were kept in the camp, on the Sundays they were not furnished transportation home. It is at least reasonably inferable, from respondent's evidence, that appellant did not want the men to leave camp on these alternate Sundays, without permission, but that they were expected to stay there subject to call, except that when the work was so near their homes, that they would lose no working time Saturday or Monday in traveling, appellant was willing for the men to go home every Sunday, if they furnished their own means of transportation. Even then some of the men said that, under such circumstances, they had been furnished transportation every week. The Railroad's evidence was that the men were free to go anywhere they chose on Sunday; that it was not necessary to tell their foremen they were going; that the Sunday work was entirely voluntary; that it was usually known on Saturday night if such work was to be done; and that the foremen arranged then for the men who were to do it. If emergencies arose on Sunday the foremen said they would call for volunteers to do the work, and that there were always enough of the men referred to as "hoboes," who stayed in camp on Sunday, to do what was necessary to be done. Another disputed matter was concerning what the men were required to do to keep themselves, their clothes and their bunk cars clean. Respondent's evidence was that he was told, when he was employed, that he was to do his washing at the

camp; that this was customarily done on Sunday; and that bedding was aired and bunk cars cleaned on Sunday. If the laundry was not done in camp, according to respondent, it would have to be taken home by the men or sent to a city laundry. It is respondent's theory that this would cause the men to lose time from work and result in delaying the track work and that by washing clothes in camp on Sunday the track work was expedited. It was shown, however, that some of the "natives" did take their clothes home to be washed. According to the Railroad's evidence, there was no requirement about when or where washing was to be done or bedding aired or bunk cars cleaned, but that the men could do as they liked about it. The Railroad had a contract with the Olympic Boarding Company to furnish the men meals and bedding. They were charged $7 per week, which was taken out of their pay, whether they went home on Sunday or not. The Boarding Company had, in addition to their cooks, employees called "bull cooks," who carried water and fuel for the cooks. They were also expected to keep the bunk cars clean and to keep the lamps in the bunk cars filled with kerosene. It was shown, however, that the "natives" usually cleaned their bunk cars because they kept them locked. This was done by respondent and the other men who lived in the car with him.

At the time respondent was injured, the bunk car camp was on a spur track in the railroad yards at Blakesburg, Iowa, a small town of about 400 population. It had been located there for two weeks or more and the track work was being done several miles southwest of Blakesburg. On Friday morning preceding the Sunday, when he was injured, respondent and the man who cared for the other motor car went to the tool car, which was kept on the house track back of the depot, on the opposite side of the railroad yards from the bunk car camp, to get gasoline for the motor cars. There were two barrels in the tool car, a dark green barrel in which kerosene was kept, and a gray barrel with a red stripe for the gasoline. They found the gasoline barrel empty. Respondent said he went to the head foreman and told him that there was no gasoline. The head foreman told him that "there ought to be; just had it filled yesterday." When he went back and looked at the kerosene barrel he found it full. He said it had not been over one-third full earlier that week when he got kerosene from it. Respondent and the other motor car man poured some of the contents of the kerosene barrel on the ground and tested it by lighting a match and discovered that it was mostly gasoline. Respondent says that he went back to the head foreman and told him that the gasoline was in the kerosene barrel and "it was a poor place for them to have gasoline." He said the head foreman said "well, you guys go get it and use it today, I will see kerosene is put in the blanket car and I will notify the men about

it.'' His failure to do so is the negligence charged. They used it in the motors and found that they were harder to start and made a black smoke from the exhaust. On Saturday they again used this same mixture in the motor ·cars. They testified to tests, with gasoline, kerosene and a mixture of the two, made just before the trial, from which they said they were sure that the barrel contained ' a mixture of a large quantity of gasoline with a small amount of kerosene.

The Railroad used gasoline only for running the motor cars and procured it from the Standard Oil Company station in Blakesburg. They furnished kerosene for the Boarding Company and it was shipped to the camp in barrels from the Railroad's storehouse at Ottumwa, Iowa. It was also used to fill lamps in the bunk cars, to burn the old railroad ties, and in the lanterns used by the men who were on ·duty as night watchmen. Respondent's evidence was that the motor car men used it to wash grease off of their hands and that all of the men used it for starting fires in the bunk car stoves; that coal was burned in these stoves, and fires were started with kerosene poured on kindling picked up along the right of way; that the men had access to the kerosene barrel and carried kerosene to the bunk cars for filling lamps and starting fires; and that in doing so they passed by the bunk car occupied by the foremen, which was on the north end of the string of bunk cars on the spur track and was the first car southwest from the place where the tool car was kept. The tool car was left unlocked all the time the camp was located at Blakesburg. There had been a lock on the car at one time but it was broken. On Sunday, October 7th, respondent remained in camp and decided about noon to wash his clothes. He put kindling in the bunk car stove, put his clothes in a can of water on the stove, and picked up the can in which the kerosene was kept but found it empty. Just then the dinner bell rang and he went to dinner. Two other men who lived in his bunk car picked up the empty water bucket and kerosene can and went to the depot. One of these men was a nightwatchman who used kerosene to fill his lantern. They had eaten a late breakfast in Blakesburg so did not go to dinner. They said that the foreman had never warned the members of the gang, and they did not know, that there was gasoline in the kerosene barrel. They filled the can from the kerosene barrel. When respondent came ˙ back from dinner, he said he picked up the kerosene can, ''poured a little on the kindling and reached over and struck a match and threw it in the stove and it exploded.'' The contents of the can caught fire and respondent's legs were very severely burned.

The Railroad filed a motion to require plaintiff to elect whether he would stand on the count based on the Federal Employers' Liability Act or that based upon the Iowa law. This motion was over-

ruled by the court and the Railroad then filed an answer which consisted of a general denial and pleas of contributory negligence and assumption of risk. It also pled misjoinder of causes of action. The jury found for respondent for $12,000, and from the judgment entered upon this verdict the Railroad has appealed.

Appellant's first assignment of error is that the court erred in not sustaining its demurrer to the evidence. Appellant contends that respondent was not at the time of his injury engaged in interstate commerce and therefore the Federal Employers' Liability Act was inapplicable; that respondent was, at the time of the injury, engaged in his own personal affairs and not acting within the scope of his employment and therefore appellant could not be liable under either the Federal or State law; and that the evidence failed to show actionable negligence upon the part of the appellant.

■ ■ In determining whether respondent can recover under the Federal Act, we must be guided by the interpretation of that act by the Supreme Court of the United States. Even the decisions of that court have not been uniform but its most recent cases have clarified the matter by reaffirming the rule that "the criterion of applicability of the statute is the employee's occupation *at the time of the injury in interstate transportation or work so closely related thereto as to be practically a part of it.*" (Italics ours.) [New York, New Haven & Hartford Railroad Co. v. Bezue, 284 U. S. 415, 52 Sup. Ct. 24, 76 L. Ed. 258, 77 A. L. R. 1370; Chicago & Eastern Ill. Railroad Co. v. Industrial Commission, 284 U. S. 296, 76 L. Ed. 304, 52 Sup. Ct. 151; Chicago & Northwestern Ry. Co. v. Bolle, 284 U. S. 74, 76 L. Ed. 173, 52 Sup. Ct. 59.] In these cases the court expressly overruled former decisions in which this test was not followed because of "the words 'interstate commerce' being inadvertently substituted for the words 'interstate transportation.' " In the Bolle case the court said:

"The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence *the test of whether an employee at the time of his injury was engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it.*" (Italics ours.)

We must, therefore, examine the precedents with this distinction in mind. Respondent here was not at any time directly engaged in interstate transportation and the question therefore is:

Was he, at the time of his injury, engaged in work so closely related to interstate transportation as to be practically part of it? There was formerly some doubt as to whether the work of repairing tracks, over which interstate trains passed, was such work. [18 R. C. L. 85, sec. 315.] This question, however, was settled by Pedersen v. Delaware, Lackawanna & Western Railroad Co., 229 U. S. 146, 57 L. Ed. 1125, 33 Sup. Ct. 648, Ann. Cas. 1914C, 153, where it was held that a member of a bridge repair gang who was injured while carrying bolts for the repair of a bridge, used by interstate trains, was within the Federal Act. The court, holding the Federal Act applicable, said: "It was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work. In other words, it was a minor task which was essentially a part of the larger one."

In Philadelphia, Baltimore & Washington Railroad Co. v. Smith, 250 U. S. 101, 63 L. Ed. 869, 39 Sup. Ct. 396, the court went further and held that the Federal Act covered a member of a repair gang who was neither engaged in repairing the track nor carrying material for that purpose. There a repair gang of bridge carpenters were living in a bunk car. A cook, also employed by the Railroad, lived in the car with them and was injured, while preparing a meal for them, when an engine ran into the car. The court said:

"The work of the bridge carpenters in the present case was so closely related to defendant's interstate commerce as to be in effect part of it. The next question is, what was plaintiff's relation to the work of the bridge carpenters? It may be freely conceded that if he had been acting as cook or camp cleaner or attendant merely for the personal convenience of the bridge carpenters, and without regard to the conduct of their work, he could not properly have been deemed to be in any sense a participant in their work. . . . *The significant thing in our opinion, is that he was employed by defendant to assist, and actually was assisting, the work of the bridge carpenters* by keeping their bed and board close to their place of work, thus rendering it easier for defendant to maintain a proper organization of the bridge gang and forwarding their work by reducing the time lost in going to and from their meals and their lodging place. If, instead, he had brought their meals to them daily at the bridge upon which they happened to be working, it hardly would be questioned that his work in so doing was a part of theirs." (Italics ours.)

The court was evidently of the opinion that bringing the meals of the repair crew to the bridge was as much a part of the work on that instrumentality of interstate transportation as was bringing a sack of bolts to the bridge in the Pedersen case, and that preparing the meals where they could get them without loss of time amounted

to the same thing as bringing to them meals, which had been prepared too far away for the crew to go for them. The same rule has been applied to an employee carrying water to workmen replacing rails on a track used by interstate trains. [Chesapeake & Ohio Ry. Co. v. Russo (Ind.), 163 N. W. 283, *certiorari* denied 282 U. S. 846, 75 L. Ed. 750, 51 Sup. Ct. 25.] But we do not think the court would have held that the cook in the Smith case engaged in interstate commerce (work so closely related to interstate transportation as to be practically a part of it) if he had been, when off duty after finishing his regular work, washing his own clothes or heating water to shave or wash himself, although as hereinafter shown, the relation of master and servant might exist while he was doing so.

In another case, (Brown's Admrs. v. Norfolk & Western Railroad Co., 12 Fed. (2d) 319), a cook's helper was killed, while getting coal either for the camp car or for his own bunk car, while the train, which was transporting both cars to the place of work, was making a temporary stop in the railroad yards. The court, in holding that recovery could be had under the Federal Act, said:

"The injury here did not occur after the end of the day's work, but at a period of enforced idleness during the day's work. . . . One may be employed while not actually engaged in the labor he is employed to perform. A section hand, who temporarily leaves his work of reballasting an interstate track to get a drink of water, or to light his pipe, does not, of course, cease to be employed in interstate commerce. . . . After the end of the day's work the act of employee must be a necessary incident of his work, or he is no longer employed within the meaning of the Federal Employers' Liability Act. But, if the act of the employee occurs at a rest interval during a day's work, the status of the employee is not changed, if the act done is, in intent, not inconsistent with the employee's duty to resume the work at the appointed time."

Respondent, here, relies upon Brock v. Chicago, Rock Island & Pacific Railroad Co., 305 Mo. 502, 266 S. W. 691, 36 A. L. R. 891, *certiorari* denied 266 U. S. 634, 69 L. Ed. 479, 45 Sup. Ct. 266. There, a gang, living in bunk cars, while engaged in repairing an interstate telegraph line, had come back to them for their noon meal. Brock was injured, after returning to his bunk car, while going across the railroad yards to get a bucket of water. This court held he could recover under the Federal Act, saying:

"The procuring of water and taking of the meal at the time and place under the circumstances and under the method in force were ancillary to the work to be done. . . . Exceptions arising out of the arrival at or departure from the place of employment and cessations necessary or identical to the work must be recognized. In this case the act of plaintiff, in taking his meal at the place and

under the conditions provided by the defendant and the acts incidental thereto, had relation to the work already done, and the work thereafter to be done on that day."

If, as said in the Smith case, taking the food to the men is part of their work, it would seem logical that taking the men to the food and returning them would, likewise, be a part of it. 2 Roberts on Federal Liabilities of Carriers, page 1391, section 739, states the rule, concerning incidental interruptions of the work, as follows:

"An employee is deemed to be in the course of his employment during the interruptions of actual service incident to the exigencies of business or of personal necessity, and while going to or from his place of work, because such activities or suspensions of activity are necessary concomitants of the employment. It is essential to the efficient discharge of duty that men at intervals minister to their personal needs, and the orderly performance of service at times requires men to stand and wait. Many of such comings and goings, diversions and interruptions, are normal and expected. But here employment approaches the line where the relation ceases to exist, and the test of its continuation lies in the degree to which the employee has separated himself from active service."

The general rule that "temporary stoppage of work for purposes which are the inevitable and necessary incidents of daily life must of necessity be in the contemplation of the parties in every employment and hence to create no suspension of the relation of employer and employee" is stated and illustrated in 18 Ruling Case Law, 583, section 88, 39 Corpus Juris, 274, section 398, 36 American Law Reports, 906 (annotation); 4 Labatts Master and Servant, 4690-96, section 1558. When such cessation of the work, for eating, drinking and other like necessities, are necessary incidents of the employment, an employee so engaged does not sever his relation from the work of interstate transportation, which he is doing and intends to continue doing for the remainder of his working hours, and he, therefore, remains under the protection of the Federal Act. [Brock v. Chicago, Rock Island & Pacific Railroad Co., 304 Mo. 502, 266 S. W. 691; Carter v. St. Louis, Troy & Eastern Railroad Co., 307 Mo. 595, 271 S. W. 358; Westover v. Wabash Ry. Co. (Mo.), 6 S. W. (2d) 843, certiorari denied 278 U. S. 632; Yarde v. Hines, 209 Mo. App. 547, 238 S. W. 151; Bradley v. Vandalia Railroad Co., 207 Ill. App. 592; Sterner v. Mich. Cent. Railroad Co. (Mich.), 204 N. W. 102; Pallocco v. Lehigh Valley Ry. Co. (N. Y.), 140 N. E. 212.] Other instances where an employee was held to be under the protection of the Federal Act, during a temporary cessation of his work during working hours are discussed in North Carolina Railroad Co. v. Zachary, 232 U. S. 248, 58 L. Ed. 551, 34 Sup. Ct. 305, Ann. Cas. 1914C, 159; New York Cent. Railroad Co. v. Marcone, 281 U. S.

345, 74 L. Ed. 892, 50 Sup. Ct. 294; Graber v. D. S. S. & A. Ry. Co. (Wis.), 150 N. W. 489; Elliott v. Payne, 293 Mo. 581, 1. c. 598, 239 S. W. 851, 1 c. 856, 23 A. L. R. 706, 1. c. 715. Likewise, ''when an employee is summoned for duty in connection with interstate transportation he is within the protection of the Federal Act as soon as he comes upon the premises of the railway company and he is also under the same protection while after leaving his duties he is passing out of the premises of his employer provided it is done within a reasonable time and along the usual route'' (or if he is completing his work after regular hours). [2 Roberts, Federal Liabilities of Carriers, 1393, sec. 739; Erie Railroad Co. v. Winfield, 244 U. S. 172, 61 L. Ed. 1057, 37 Sup. Ct. 556; C. M. St. P. & Pac. Railroad Co. v. Kane (C. C. A.), 33 Fed. (2d) 866, *certiorari* denied, 280 U. S. 588, 74 L. Ed. 637, 50 Sup. Ct. 37; Dennison v. Payne (C. C. A.), 293 Fed. 333; S. P. & L. A. Railroad Co. v. Davide (C. C. A.), 210 Fed. 870; Lamphere v. Oregon Railroad & Navigation Co., 116 C. C. A. 156, 196 Fed. 336, 47 L. R. A. (N. S.) 1; Lopez v. Hines (Mo.), 254 S. W. 37; Laughlin v. Mo. Pac. Ry. Co., 297 Mo. 345, 248 S. W. 949; Williams v. Schaff, 282 Mo. 497, 222 S. W. 412; Crecilius v. Chicago, Milwaukee & St. Paul Railroad Co., 284 Mo. 26, 223 S. W. 415; Wagner v. C. & A. Ry. Co., 209 Mo. App. 121, 232 S. W. 771; Salabrin v. Ann Arbor Railroad Co. (Mich.), 160 N. W. 552; Saunders v. Southern Ry. Co. (N. C.), 83 S. W. 573; see, also, 36 A. L. R. 906 (annotation); M., K. & T. Ry. Co. v. Rentz (Tex.), 162 S. W. 959; Easter v. Virginian Ry. Co. (W. Va.), 86 S. E. 37.]

It would, of course, be much easier to administer the Federal Act if it applied to all the work of all employees, of railroads engaged in interstate transportation. However, ''owing to the fact that during the same day, railroad employees often and rapidly pass from one class of employment to another, the courts are constantly called upon to decide those close questions where it is difficult to define the line which divides the State from the interstate business.'' [N. Y. Cen. Railroad Co. v. Carr, 238 U. S. 260, 59 L. Ed. 1298, 35 Sup. Ct. 780.] This is necessary because the question is the fundamental one of jurisdiction. If the employee is not engaged in commerce ''among the several states,'' Congress has no authority to legislate concerning his rights and remedies for injuries sustained. [Article 1, Sec. 8, Clause 3, Constitution of the United States.] Likewise, if he is so engaged, since the entire subject of injuries in interstate commerce is so completely covered by Federal Acts, the States cannot make any provisions concerning them regardless of whether or not Congress has provided liability for every injury. [N. Y. Cent. Railroad Co. v. Winfield, 244 U. S. 147, 61 L. Ed. 1045, 37 Sup. Ct. 546.] It is, therefore, the nature of the work which the employee was doing

*at the time* of the injury and not what he later expects to do which determines the question. [See the recent Bezue, Bolle, and Industrial Commission cases, supra; also, Erie Railroad Co. v. Welch, 242 U. S. 303, 61 L. Ed. 319, 37 Sup. Ct. 116; Ill. Cent. Railroad Co. v. Behrens, 233 U. S. 473, 478, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163; C., B. & Q. Railroad Co. v. Harrington, 241 U. S. 177, 60 L. Ed. 941, 36 Sup. Ct. 517; Shanks v. D., L. and W. Railroad Co., 239 U. S. 556, 60 L. Ed. 436, 36 Sup. Ct. 188.] For example, although section men repairing an interstate track are working upon an instrumentality of interstate transportation and therefore are under the protection of the Federal Act, yet when one of them is taken from this work and put to work "burning a fire guard outside the right of way to prevent the destruction of the adjoining farmer's hay and saving the defendant from liability he was not engaged in interstate commerce when injured." [Myers v. C., B. & Q. Railroad Co., 296 Mo. 239, 246 S. W. 257, *certiorari* denied, 261 U. S. 624, 67 L. Ed. 832, 43 Sup. Ct. 519.] So, also, where a track laborer was injured while mowing grass on the railroad right of way in compliance with a state statute which required the railroad to "cause all Canadian thistles, white and yellow daisies and all other noxious weeds growing on lands owned or occupied by it to be cut down twice in each and every year," it was held, that if this work was being done simply to comply with the state statute, he is not engaged in interstate commerce. [Plass v. C., N. E. Railroad Co., 226 N. Y. 449, 123 N. E. 852; see, also, Quirk v. Erie Ry. Co. (N. Y.), 139 N. E. 556; Southern Pacific Ry. Co. v. Industrial Commission (Utah), 264 Pac. 965, *certiorari* denied, 278 U. S. 605, 73 L. Ed. 533, 49 Sup. Ct. 11.] Neither is an employee loosening rock in a quarry so engaged, although the rock was to be hauled a few miles away and used for ballasting a track. [Conway v. Southern Pac. Ry. Co., 248 Pac. 115; McLeod v. Southern Pac. Ry. Co., 299 Fed. 616.] Nor is an employee, while unloading ties to be stored along the right of way for future use. [Sailor v. Mo. Pac. Ry. Co., 18 S. W. (2d) 82.] Nor an employee unloading poles to be later used for repair of an interstate telegraph line. [Fenstermacher v. C., R. I. & Pac. Ry. Co., 309 Mo. 475, 274 S. W. 718, *certiorari* denied, 269 U. S. 576, 70 L. Ed. 420, 46 Sup. Ct. 102.] Nor an employee disconnecting old rails which had been removed when a track was repaired and left on the right of way. [Seidel v. St. L.-S. F. Ry. Co. (Mo. App.), 18 S. W. (2d) 126; see, also, Begley v. Mo. Pac. Ry. Co. (Kan.), 280 Pac. 902, *certiorari* denied, 280 U. S. 613, 74 L. Ed. 655, 50 Sup. Ct. 162.] Nor an employee mining coal for use in interstate engines. [D., L. & W. Ry. Co. v. Yurkonis, 238 U. S. 439, 59 L. Ed. 1397, 35 Sup. Ct. 902.] Nor an employee taking coal to bins or chutes where it would be used by engines in

interstate traffic. [C., B. & Q. Ry. Co. v. Harrington, 241 U. S. 177; C. & E. I. Railroad Co. v. Industrial Commission, 284 U. S. 296, 76 L. Ed. 304, 52 Sup. Ct. 59.] It has also been held that a station agent, at a station on an interstate railroad line, who sold tickets to points outside the state and handled interstate freight, although he had previously made out reports in connection with the railroad's interstate business, was not engaged in interstate commerce in starting a fire with kerosene in the station stove for the purpose of warming the building. [Benson v. Bush, 104 Kan. 198, 178 Pac. 747, 10 A. L. R. 1165.] One of the recent decisions of the Supreme Court of the United States, above referred to, also holds that supplying heat to buildings where interstate work is done is not interstate commerce. [C. & N. W. Ry. Co. v. Bolle, supra.]

■ ■ It will therefore be seen that it is not the general employment of the employee, which determines whether or not he is engaged in interstate commerce, but that this is determined by what he is doing *at the particular time.* As shown above, an employee after he has stopped his actual work is under the protection of the Federal Act for a reasonable time in which to leave the railroad premises and under the authorities above quoted this includes, if necessary, taking him to a place where he can conveniently reach his lodgings and also includes, if necessarily incidental to the work, a reasonable time to wash, clean up, and change clothes before leaving the premises. Certain classes of railroad employees because of exigencies of the service, frequently lodge, sleep and eat in the railroad company's cars during hours off duty. This, however, does not make them engaged in interstate commerce while they are off duty. [2 Roberts, Federal Liabilities of Carriers, 1401, sec. 739; Bumstead v. Mo. Pac. Ry. Co., 99 Kan. 589, 162 Pac. 347, L. R. A. 1917E, 734; Smith v. C., M. & St. P. Ry. Co. (Minn.), 195 N. W. 534, *certiorari* denied, 264 U. S. 582, 68 L. Ed. 860, 44 Sup. Ct. 331; Brown v. Pere Marquette Ry. Co. (Mich.), 213 N. W. 179, *certiorari* denied, 275 U. S. 538, 72 L. Ed. 413, 48 Sup. Ct. 35; Pryor v. Bishop, 148 C. C. A. 25, 234 Fed. 9; Bishop v. Delano, 265 Fed. 263, *certiorari* denied, 254 U. S. 632, 65 L. Ed. 448, 41 Sup. Ct. 7; for contrary decision see Sanders v. C. & W. C. Ry. Co. (S. C.), 81 S. E. 283.] In the Bishop case a member of a train crew who had finished his interstate run, but was subject to call for an interstate trip to which he had to respond, if given, in an hour, slept in a caboose in the railroad yards. The court held that he was not engaged in interstate commerce, saying:

"If, however, he could be deemed to be in the employment of the company at the time of the injury, nevertheless he was not then actually employed in interstate commerce. *His actual employment at the time was holding himself ready in the city* of Chicago to respond to a call for service. That the call, when it came, would be for an interstate

trip, does not make the waiting in Chicago an actual engagement in interstate commerce within the terms of the Federal Act.''

The case of Chicago, Milwaukee & St. Paul Ry. Co. v. Kane, 33 Fed. (2d) 866, where a man employed for track repair work spent the night at the bunk car camp and was killed the next morning before he began actual track work, would seem in its general statements to hold otherwise and imply that the applicability of the Federal Act was to be determined by the general employment. However, that case might be justified on the theory that the deceased had already been called for work and was killed while making his preparation to do so in response thereto. It seems that the court so considered it, since it based its decision principally upon the Lamphere case where an employee was killed on his way to work.

When respondent, here, was working on the track he was engaged in work so closely related to interstate transportation as to be practically a part of it and was, therefore, under the test established by the Supreme Court of the United States, engaged in interstate commerce. When at the beginning of the day he was called for this work, he was, from the time he responded to the call, within the protection of the Federal Act. He remained within its protection throughout the day, if he intended to continue to work, although he went at noon to the bunk cars to eat his meal and although he ceased work for any other purpose necessarily incidental to the day's work. But when he ceased that work and returned to his bunk car at the end of the day he was off duty, so far as track work was concerned, until called for such work the next morning, whether the intervening time was a week day or Sunday. As said in the Bishop case, supra, *his actual employment, then, was holding himself ready to respond to a call to service.* In so doing, was he engaged in work so closely related to interstate transportation as to be practically a part of it? If, as in the Myers case, supra, he had been taken off the track work and put into a farmer's field to fight fire for the purpose of saving the railroad from liability for damages, he would not have been so engaged. Why would he be so engaged when he is taken off the track work and put to sleep in a bunk car? Or put there to rest and clean up on Sunday? Our conclusion must be that respondent, in building a fire in the bunk car, even though he was there at appellant's direction and subject to call to work on the track if an emergency had arisen, was not engaged in such work, whether he was building the fire to heat the bunk car, to heat water to wash his clothes, or to heat water to wash himself. Therefore, we hold that the case should not have been submitted upon the theory that appellant was liable under the Federal Employers' Liability Act.

This, however, does not necessarily mean, as appellant contends, that the relation of master and servant had ceased; that re-

spondent was, therefore, acting outside of the scope of his employment; and that respondent had no cause of action based upon the law of Iowa. As we have seen, a railroad employee may be acting within the scope of his employment in doing various kinds of work but not be engaged in interstate commerce. While building a fire in the bunk car stove was not incidental to respondent's work of repairing the track so as to be part of it (that is, it was not a minor task which was essentially a part of the larger one of track repairs), it may have been necessarily incidental to living in appellant's bunk car if he was required to live there under the terms of his employment and expected to do his washing there. (He said he was told to do it there.) We think such a case as Sanders v. C. & W. C. Ry. Co. (S. C.), 81 S. E. 283, fails to make this distinction, which is made in the Bishop case, and that the failure to make it is due to the confusion of the terms "interstate commerce" and "interstate transportation" referred to by the Supreme Court of the United States in the Bezue, Bolle, and Industrial Commission cases. Saying that an employee, sleeping in a bunk car, as in the Sanders case, is engaged in work so closely related to interstate commerce as to be a part of it, simply means that the court is determining the question, not by what the employee is doing at the time, but by general character of the work he is employed to do. The Supreme Court of the United States says this must not be done. But it is obvious that an employee, who is required to remain in quarters furnished by the employer, is in a far different situation than one who goes to his own home at night. Under such circumstances, he does not occupy the premises as a boarder or tenant, but as a servant. This is true whenever "the occupancy is for the benefit of the master and as an accessory or aid to the performance of his duties as a servant." [Wood on Master & Servant, 308, sec. 155.] In such cases the master is liable for injuries caused by a defective condition of the premises. [Sidentop v. Buse, 47 N. Y. Supp. 809; Anderson v. Steinreich, 66 N. Y. Supp. 498; Collins v. Harrison (R. I.), 56 Atl. 678, 64 L. R. A. 156; Mullery v. Mo. & Kan. Tel. Co., 180 Mo. App. 128, 168 S. W. 213.]

So, likewise, the master is liable, under such conditions, for any negligence which makes the place where he required his employee to stay, unsafe. Illustrations of this rule are made by the following cases: An employee in a railroad construction camp, asleep in a tent furnished by the employer, injured by a rock thrown upon the tent, by the blasting during the progress of the work, was allowed to recover for his injuries. The court said: "The master, who had furnished him this lodging, located at a place made dangerous by the discharging of blasts in conducting the master's business, owed him the duty of giving him timely warning to enable him to avoid the danger." [Orman v. Salvo (C. C. A.), 117 Fed.

233.] In Moore v. Minn. & St. Paul Ry. Co. (Minn.), **142 N. W.** 152, it was held that a brakeman could recover for injuries sustained in the railroad yards while on his way to get his evening meal; he had remained in the caboose to sleep, although off duty and not called for his next run. The court said: "There was clearly an invitation to the men to use this car for sleeping purposes as an incident to their employment. In such case they are employees while upon said car and while necessarily going to and from the same." In Moyse v. Northern Pac. Ry. Co. (Mont.), 108 Pac. 1062, a freight conductor off duty, but required to be within call, went to sleep in a caboose in the railroad yards. He was injured because the brakes on the caboose were not set properly and it rolled into an excavation. The court held that he was there to be within call; that he was, therefore, in the discharge of his duty; and that the defendant was required to use ordinary care to furnish a reasonably safe place for the use of plaintiff and to maintain it in that condition.

In another case, St. Louis, A. & T. Railroad Co. v. Welch (Tex.), 10 S. W. 529, 2 L. R. A. 839, the foreman of a bridge repair gang was sleeping in a bunk car which was struck by a train. He was subject to orders to go out on duty at any time. The court held that plaintiff was a fellow servant of the employees operating the train, saying:

"We think he must be held to have been upon duty at the time he received the injury. That the accident occurred when he was resting from his labors, we think makes no difference. He was subject to the call of the company at the time, and his case differs from that of other servants who engage for certain hours of employment, and who are injured during the intervals in which the master has no claim upon his services."

In I. & G. N. Railroad Co. v. Ryan, 18 S. W. 219, a bridge repair gang carpenter off duty was sitting in his bunk car writing a letter at night. He paid 66 2/3 cents per day for board. The car was run into by a switch engine and he was injured. The court held that plaintiff and the employees in charge of the engine were fellow servants, saying:

"He was, in contemplation of law, in the employment of the company at the time of the collision. His presence in the car·on the side track at the time of the collision can be explained in no other way, under the proof. It was only by reason of the fact that he was an employee of the company that he was in the car on the side track at the time he was injured."

Likewise, in Illinois Central Ry. Co. v. Panebiango, 129 Ill. App. 1, members of a track repair gang "lived, ate, cooked and slept in these boarding cars, which were provided by appellant for that purpose. The men furnished and cooked their own provisions, and appellant had no connection therewith. . . . Appellee was ill and

did not go to work. In the afternoon he prepared to bake bread, and about four o'clock he put his dough upon a board, got out of the car on the west side and started under the car with the dough, intending to go to the oven and bake it.'' He was injured when a train struck the car. The court said:

''There is no merit in the contention that appellee was not in the employ of appellant because he happened not to be working that day. Heldmaier v. Cobbs, 195 Ill. 172. He was in the regular employ of appellant; was paid monthly when the pay car came along; and was furnished by appellant with a car in which to cook, eat, sleep and live for months at a time. The relation of employer and employee, and the right of appellee to occupy the car, did not cease because of his temporary absence from work on account of illness. . . . The company furnished these cars in which the men should sleep, and stoves upon which they should cook and dishes for their table, and a foreman who lived with them, and we consider it altogether too narrow a construction of the relations between appellee and appellant to say that it had no responsibility for or control over the men except during the hours when they had shovels, picks and spades in their hands.''

None of the above cases were brought under the Federal Employers' Liability Act. [See, also, Pugmeir v. Oregon Short Line Railroad Co. (Utah), 92 Pac. 762, 13 L. R. A. (N. S.) 565, 126 Am. St. Rep. 805; Larson v. Industrial Accident Comm. (Cal.), 224 Pac. 744; Walker v. Speeder Mach. Corp. (Iowa), 240 N. W. 725; Guastelo v. Mich. Centl. Railroad Co. (Mich.), 160 N. W. 484, L. R. A. 1917D, 69; Papinaw v. Grand Trunk Ry. Co. (Mich.), 155 N. W. 545; Holt Lbr. Co. v. Industrial Comm. (Wis.), 170 N. W. 366; 36 A. L. R. 917, (annotation); 12 L. R. A. (N. S.) 855, (annotation); 18 R. C. L. 584, sec. 88; 39 C. J. 275, sec. 399; 4 Labatts Master & Servant, 4684, sec. 1556.] Under these authorities it would seem apparent that there was substantial evidence from which the jury could find that the relation of master and servant existed between respondent and appellant at the time of his injury. Nor would this court hesitate to say, if such a case arose under our Workmen's Compensation Act, that the injury arose out of and in the course of the employment. This court has held that an injury does so arise whenever the employees are ''at any place where their services, or any act, task, or mission which forms a necessary part of their services, may reasonably require them to be.'' [Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S. W. (2d) 129.] This is true whether the employee be changing a tire on his automobile in the basement of his home, (Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601) or riding in an airplane. [Crutcher v. Curtiss-Robertson Airplane Mfg. Co., 331 Mo. 169, 52 S. W. (2d) 1019.]

1192

■ ■ This brings us to appellant's final contention upon the demurrer to the evidence that actionable negligence on appellant's part, sufficient to make appellant liable either under the Federal Act or under the Iowa law, was not shown. Respondent's theory as alleged in his petition and hypothesized in his instructions is that when he was washing his clothes in the bunk car he was performing work which he was employed to do in a place where he was employed to do it; because it was necessarily incidental to living in the bunk car camp where he was required to live under the terms of his employment. Therefore respondent's theory of appellant's negligence is that it was appellant's duty to furnish him a safe place to work (wash his clothes) and safe appliances with which to work (kerosene with which to make a fire rather than explosive gasoline); that appellant was remiss in the performance of this duty, when after notice to its foreman of the dangerous mixture in the kerosene barrel and assurance to respondent that the condition would be remedied, it allowed the mixture to remain there, failed to warn the men that it was there and provide kerosene for them in another place, and permitted them to continue to take the dangerous mixure to use in their bunk cars without knowing of the danger; and that this (furnishing unsafe appliance for building fires) caused respondent's place of work (for washing his clothes) to become unsafe and resulted in his injuries. It would seem that appellant's liability might be based upon a simpler theory of negligence. That is: If appellant undertook to furnish its employees kerosene, food, drink or any other thing for their use while living in its bunk car camp (where they lived because it was to appellant's advantage to have them live there in order to keep proper organization to do the work) it would necessarily be under the duty to furnish such as would not be dangerous and harmful. It would make no difference whether it was required to furnish such articles or voluntarily did so for any reason. It would not be necessary that they be appliances with which to work or that they made the place of work unsafe. If under such circumstances, it knowingly furnished to its employees a dangerous explosive, poisonous food or drink or some other dangerous or defective substance or article for any ordinary proper use, it would be liable for injuries resulting therefrom. [26 C. J. 787, sec. 98 (unwholesome food); 39 C. J. 261, sec. 381 (impure water); 45 C. J. 846, sec. 264 (dangerous instrumentalities); 18 R. C. L. 603, sec. 102.] Injuries from such causes would also arise out of and in the course of the employment. [10] Instructing the jury that it was necessary to find that appellant required the men to stay in the bunk car camp on Sunday and wash their clothes there, that the bunk car was a place of work, and that the kerosene was an appliance furnished by appellant with which to do work for appellant's

purposes, undoubtedly was an assumption by respondent of an unnecessary burden as to the negligence which he was required to prove. This, of course, was the result of his contention that in washing his clothes he was engaged in interstate commerce.

Respondent had evidence that appellant furnished kerosene for filling the bunk car lamps and for filling the lanterns of the night watchmen; that the men were permitted to take it to the bunk cars for that purpose; and that one of the men who got the supposed kerosene on the day respondent was injured was a night watchman. It is at least a fair inference from the evidence that it was known to appellant's foreman that the men also used it for starting fires and that appellant allowed them to use it for that purpose. As said in Benson v. Bush (Kan.), 178 Pac. 747, 749, "everybody knows that folks will start fires with coal oil." [See, also, Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159, 53 L. Ed. 453, 29 Sup. Ct. 270; Ellis v. Republic Oil Co. (Iowa), 110 N. W. 20.] Respondent also had evidence to show that there was gasoline in the kerosene barrel; that he informed the head foreman of that fact, two days before the gasoline which burned him, was procured from that barrel; that the head foreman said he would put kerosene, for use in the bunk cars, in the blanket car and would warn the men not to use the contents of the kerosene barrel in the tool car; and that the head foreman had ample opportunity to do so, in the intervening forty-eight hours during which the men were assembled to go to or return from work at least eight times and were in their bunk cars on two nights thereafter, but failed to do so. Our conclusion, therefore, is that the case should not have been submitted to the jury under the Federal Employers' Liability Act, but that respondent made a case for the jury on his second count based upon the law of Iowa. Appellant's demurrer to the evidence was therefore properly overruled.

The next question is whether, since the case was submitted to the jury under instructions drawn on the theory that the Federal Employers' Liability Act applied, the verdict can stand. Respondent had two main instructions. One of them hypothesized the facts (about being required to live in the bunk car and wash clothes there) which respondent believed brought the case within the Federal Act and instructed the jury that, if they found those facts to be true, he was engaged in interstate commerce. The other commenced with the abstract statement that it was the duty of appellant to use ordinary care to provide for respondent "a reasonably safe place to work and reasonably safe appliances with which to work." It then gave the jury the following test of negligence:

"If the jury believe from the evidence that there was any extraordinary and unusual danger to plaintiff with reference to gasoline and kerosene or coal oil of which plaintiff's co-employees had

no knowledge and of which the defendant, acting through and by its officers and foremen, did have knowledge, and that such lack of knowledge, if any, of said co-employees did endanger the personal safety of the plaintiff and did cause the appliances with which he was required to work to be unnecessarily and unreasonably dangerous, then, it was the duty of defendant's said officers and foremen to exercise ordinary and reasonable care and caution to warn and instruct plaintiff's co-employees with reference to such extraordinary and unusual danger, if any. A failure to perform these duties, if you believe from the evidence that there was such failure, is negligence within the meaning of these instructions.''

The instruction then set out in full detail the facts which the jury must find in order to find a verdict for plaintiff. In addition to these facts the jury were required by this instruction to find that respondent was engaged in interstate commerce which required a finding of the facts set out in his other instruction. It also required the jury to find that his injuries arose out of and in the course of his employment. This finding was necessary under the Iowa law to cut off appellant's defenses of contributory negligence and assumption of risk. Other instructions covered the Federal rule of assumption of risk and contributory negligence in diminution of damages. Respondent contends that he pled the facts alternatively in separate counts; that he stated a cause of action under the Iowa law; that the instructions required the finding of every fact necessary for recovery under the Iowa law, in addition to requiring the finding of a great many other facts not necessary for recovery under the Iowa law; and that this merely placed an additional burden upon him. In short, he says that the Federal Act was more favorable to appellant than the Iowa law and, since it had the benefit of having the case submitted under the most favorable law, appellant is in no position to complain. This court recognized the propriety of respondent's contention in William v. Schaff, 282 Mo. 497, 222 S. W. 412, when in holding that the Federal Act was not as favorable to a railroad as the law of Missouri, it said:

''The substantive rules of tort liability, as fixed by the adjudications in this State, differ materially from those which obtain in cases falling under the Federal statute; particularly in regard to the doctrines of contributory negligence and assumption of the risk. Under the law of the State, contributory negligence on the part of an injured party is usually a defense; whereas under the Federal statute it goes only to reduce damages; and assumption of the risk is given a wider scope by the national courts than is allowed in Missouri. The Supreme Court of the United States has held that in a case within the act of Congress, the Federal law 'is exclusive and supersedes State laws upon the subject.' [Chicago Ry. Co. v.

Wright, 239 U. S. 548, 551.] For these reasons it is plain that if a cause of action was not within the scope of the act, but was tried as though it were, *it must be retried, unless the rules of law, affecting liability and as established by the courts of the State are the same as those which obtain under the Federal statute or are less favorable to the party against whom the verdict was given."* (Italics ours.)

It would appear that we have, here, the very situation which this court referred to in the Schaff case. Under the law of Iowa an employer who rejects the Workmen's Compensation Act, as appellant in this case did, is not allowed, in case an employee sustains an injury arising out of and in the course of his employment, the defense of assumption of risk or the defense that the employee was negligent, "unless such negligence was willful and with intent to cause the injury, or the result of intoxication on the part of the injured party." [1927 Code of Iowa, 222, sec. 1375.] Furthermore, in making a case for the jury, an employee has the benefit of a presumption of negligence from the fact that he sustained an injury arising out of and. in the course of the employment. [1927 Code of Iowa, 223, sec. 1379.] Under the Federal Act appellant was entitled to the defense of assumption of risk, and to urge contributory negligence in diminution of damages, and the jury were instructed that these matters should be considered in arriving at their verdict. They were also instructed that they must find that respondent in washing his clothes was doing something which by the terms of his employment he was required to do in a place where he was required to do it. It would seem, therefore, that appellant had the case submitted on the theory most favorable to it both as to the law which applied and the negligence which respondent was required to prove. The Supreme Court of the United States has applied the converse of this proposition; that is, where the case was submitted under the State law, which was essentially the same or more favorable to the railroad than the Federal Act, although the Federal Act applied, the railroad cannot complain. [Chicago & Northwestern Railroad Co. v. Gray, 237 U. S. 399, 59 L. Ed. 1018, 35 Sup. Ct. 620; C., R. I. & Pac. Ry. Co. v. Wright, 239 U. S. 548, 60 L. Ed. 431, 36 Sup. Ct. 185.] It has also held that, where the judgment rendered was based on the Federal Employers' Liability Act, even though the defendant was not engaged in interstate commerce and the case should be governed by the law of Kansas, "these questions are immaterial here since the Kansas statute is so similar to that of the United States that the liability of the defendant does not appear to be affected by the question of which of them governed the case. In such circumstances it is unnecessary to decide which law applied. [K. C. W. Ry. Co. v. McAdow, 240 U. S. 51, 60 L. Ed. 520, 31 Sup. Ct. 252.] In

another case, it sustained a recovery under the state law where the petition alleged employment in interstate commerce. When the evidence failed to show such employment, the court treated the allegation respecting interstate commerce as eliminated and submitted the case under the state law. [Wabash Ry. Co. v. Hayes, 234 U. S. 86, 58 L. Ed. 1226, 34 Sup. Ct. 729; see, also, N. Y. C. Railroad Co. v. Kinney, 260 U. S. 340, 67 L. Ed. 294, 43 Sup. Ct. 122; Seaboard Air Line v. Koennecke, 239 U. S. 352, 60 L. Ed. 324, 36 Sup. Ct. 126.] This court, in Sullivan v. St. L.-S. F. Ry. Co., 321 Mo. 697, 12 S. W. (2d) 735, approved the submission of a case under the state law which was brought under the Federal Act. In so doing it exhaustively reviewed the authorities and quoted approvingly from the Hayes case as follows:

"The plaintiff asserted only one right to recover for the injury, and in the nature of things he could have but one. Whether it arose under the Federal Act or under the state law, it was equally cognizable in the state court; and had it been presented in an alternative way in separate counts, one containing and another omitting the allegation that the injury occurred in interstate commerce, the propriety of proceeding to a judgment under the latter count, after it appeared that the first could not be sustained, doubtless would have been freely conceded. Certainly, nothing in the Federal Act would have been in the way."

It is proper for a plaintiff to combine in his petition a count on the Federal Act and one on the state law "for he may not be able to prove a cause of action under the Federal statute and if he had only a cause of action stated under the statute he might be defeated in not being able to prove it; and then when he sues under a state statute or at common law, the defendant might defeat him by showing the liability was under the Federal statute, if the question of *res judicata* did not stop it." [Thornton's Federal Employers' Liability Act (3 Ed.) sec. 203; see, also, 2 Roberts Federal Liabilities of Carriers, Chap. 48.] This court has held that our law only requires "that the petition shall contain a plain and concise statement of the facts constituting the cause of action and the relief to which the plaintiff may suppose himself entitled. Its sufficiency is judged by the answer to the question, do these facts entitle the plaintiff to relief under the laws in force in this state, and in considering it, the general laws, whether State or Federal, must be considered. It is not necessary that these laws be mentioned or in any way identified in the pleading." [Pipes v. Mo. Pac. Ry. Co., 267 Mo. 385, 184 S. W. 79.] Of course, if a party relies upon the statute of another state, he must plead it and respondent did plead the laws of Iowa. When it comes to submitting the case, the jury should be instructed under the law which the evidence shows to be

applicable. If appellant was prejudiced by the failure to do so, the judgment could not stand. If this case had been submitted to the jury, under the requirements (less favorable to appellant) of the Iowa law, had respondent been injured on track work to which the Federal Act applied, that would be reversible error. Nor could the verdict, here, stand if the Iowa law which applies was more favorable to appellant than the Federal Act. (As was the Missouri law in the Schaff case.) But the case was submitted upon the theory most favorable to appellant; the theory which gave it the benefit of defenses it did not have under the applicable Iowa law; and a greater burden was thereby placed upon respondent than the law required. Appellant was benefited and not prejudiced thereby. Therefore, appellant is not entitled to a reversal.

Appellant assigns a number of errors in connection with the instructions given for respondent and its refused instructions (mostly withdrawal instructions). Most of these assignments are merely copied in its points and authorities without any statement of reasons and without citation of authority. Most of appellant's argument as to them is with reference to the Federal Employers' Liability Act. Whatever may be said of these criticisms as applied to the Federal Act we find the instructions sufficient under the Iowa law.

█ The final contention made by appellant is that the verdict is excessive. Respondent was twenty-two years old at the time of his injury. While at the time of the trial, he was working in the parts department of a Ford automobile distributing agency for which he was receiving practically the same monthly wages as he got from the Railroad when injured, the kind of work he was able to do was very limited, and whether he could continue to obtain such employment was at least questionable. His legs were very severely burned in large areas and he suffered great pain for many weeks. He was in the hospital two and one-half months, and had unhealed sores on his legs for some time thereafter. Physicians described his injuries as third degree burns, which is the designation of deepest burns. They said that the burns "in areas at least have destroyed subcutaneous tissue and some muscles; have also destroyed superficial nerves and blood vessels, and insofar as there has been destruction of the blood vessels, the venous circulation more particularly, there will be a sluggish return of the blood from his feet and limbs." They also said that nerve tissue had been destroyed and that this would cause irritation because "the effect from heat and cold will be augmented;" and that respondent was disabled from heavy manual labor such as he did prior to his injury. It was shown that respondent's legs swell, cramp and ache; that they itch and burn because of the destruction of the return circulation; and that this condition causes loss of sleep. It was further shown that respond-

1198

ent can only do light work; that he has tried to do such work as washing windows and changing tires, in the garage where he was employed, but that he was unable to do it because his legs were stiff and he could not, without pain, stoop or bend; that his improvement was as great at the time of the trial as it would ever be; and that the tendency will be to get worse as he gets older. While respondent has received a large verdict, in view of this testimony, we cannot say that the verdict of the jury was excessive.

The judgment is affirmed. *Ferguson, C.,* concurs; *Sturgis, C.,* dissents.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. *Gantt, P. J., Frank* and *Atwood, JJ.,* concur; *Ragland, J.,* concurs in result.